Good morning, your honors. May it please the court, my name is Katherine O'Daniel on behalf of the Appellant Herberto Pulgar. This is a single-issue appeal that comes to this court from the Central District of Illinois following a conviction after a jury trial of the offense of conspiracy to distribute cocaine. The sole issue that appears before this court today is whether or not the government proved the extra agreement necessary in a conspiracy or did the government prove simply a buyer and seller arrangement, a series of transactions. It is our contention that in the light most favorable to the conviction that the government proved a series of drug transactions over an 11 year period that were on again, off again, but the government did not prove and there was no evidence in the record of anything with respect to Mr. Pulgar's that he would pick up the phone and he would call Mr. Pulgar when he was ready to receive more drugs. Mr. Schmidt would then, then testified that he would then repackage and redistribute to his network of buyers, which was specifically one individual who was also named in the indictment whom Mr. Pulgar never knew, but there was no evidence of Mr. Pulgar's behavior after these transactions with Mr. Schmidt. From Brown forward this court has taken a holistic approach and circumstances of each one of these very complex buyer-seller cases that comes before this court and conspiracy is found when there is an interested and informed cooperation between the buyer and the seller. In this case there was no interested and there certainly was no informed cooperation between Pulgar and Schmidt. Each transaction according to Mr. Schmidt, the government's witness, was its own transaction. It began and ended when one person's bringing money and the other is supplying drugs. This was not a situation where there was fronting going on or credit transactions and I'll get to that in a moment, but in addition, and I'm kind of borrowing back into the 90s cases, this was not a type of deal that was standardized each time. The locations were different. Mr. Pulgar would arrive in different cars. Mr. Schmidt said things would change as the transactions were unfolding and he would never know what kind of car Mr. Pulgar would arrive in. And I know that the government placed a lot of emphasis on a relationship of trust between them, but I point out the differences in the cars because Mr. Pulgar never told Mr. Schmidt when, where, he never gave him specifics. Now the government tries to hang the conviction on this fronting argument that Pulgar fronted drugs to Schmidt. Well, the evening of Schmidt's arrest, he said to the agents, Pulgar never fronted me drugs. I always had to pay for them up front. A month later, the lead case agent goes in the grand jury and testifies under oath. Pulgar never fronted. Schmidt always had to pay up front and he adds this phrase, he said, Schmidt was the kind of guy that didn't like to owe anybody anything. And none of the reports in the nine months between Schmidt's arrest and Pulgar's jury trial, no report said anything contrary other than that Schmidt always paid up front. Now, Pulgar never consulted with Schmidt on Schmidt's business. He didn't offer him advice. He didn't try to expand his client base. He didn't help him bag or repackage cocaine. He didn't supply security. He didn't supply trapped automobiles. He didn't give him cell phones. Like a lot of the cases that have come before this court, none of those things are here. None of those earmarks of a conspiracy are here. Schmidt's testimony itself said that his dealings with his client, Myers, who was also a named co-defendant, but whom Pulgar never met. Schmidt said that my dealings with Myers were my business and what I did with my cocaine after Pulgar sold it to me was my business. And it was not... Did you say that he was the only client that Schmidt had? Mike Myers was... the evidence showed that Mike Myers was his main client. I can't answer whether he was his only client. That's the evidence. The evidence at trial, yes, Your Honor. And Schmidt specifically testified, if I made four million dollars or nothing, nothing at all, it had nothing to do with Mr. Pulgar. Schmidt could have flushed the cocaine down the toilet that had nothing to do with Mr. Pulgar, according to Schmidt's own testimony. Schmidt never divided any of his profits with Mr. Pulgar and, like I said, there were never discounts, there was never any quid pro quo, and most importantly, they were never ever on the single side of one transaction in 11 years. And the most important salient factor here is that Pulgar's fee did not in any way depend on Schmidt's ability to go and resell. And that's because the transactions were completed up front. Schmidt tendered the entire purchase price to Pulgar every time up front. So he did... Pulgar wasn't waiting for Schmidt to go out and be able to collect all of his profits to come back to Pulgar. It was not that kind of an arrangement. Johnson points out the three factors that courts... that this court has established in looking at the buyer-seller versus conspiracy, and those are multiple large-quantity purchases on credit. Multiple on credit. We do not have that in this case. In the light most favorable to the conviction, Schmidt said for the first time at trial, well maybe it happened a couple of times. But when asked to give one example of a fronting transaction in an 11-year period, Schmidt said, well, the day that Pulgar got arrested, he came down and met me at a gas station and he asked me, hold on to the money because I'm going to go to Logan County Courthouse where I have a traffic court, a routine traffic court hearing. I'm going to get the money when I come back to Chicago. Translation, it was a measure of self-preservation. He didn't want to take $27,000 through the... into a courthouse, wisely. And he asked Mr. Schmidt to hang on to that $27,000. That, under no stretch of the imagination, can that be viewed as a credit transaction, especially in light of the fact that the government played the telephone calls that led up to that time. And this couldn't be evidence of conspiracy because the conspiracy ended when Mr. Schmidt began to cooperate with the government. But those telephone calls that led to that gas station deal, Mr. Schmidt had said the day before, I've got all the money. I won't have it until Thursday. On Thursday, I will have it all. So that can't be viewed in any reasonable way as a credit transaction. Now the... and the other thing is, the government spent a lot of time talking about an established return policy. I went back through the record 10 times. I reread, reread, reread, after I got the government's response brief stating that Mr. Schmidt had an established policy with Mr. Polgar whereby he could return unsold amounts of cocaine. At first blush, I thought, I don't remember that from the trial. I'm gonna go back and make sure. I put in my response brief... I mean, my reply to some total of that evidence. He never once said that. Instead, what he did say was, if I got really bad cocaine, I had the ability to go back to Mr. Polgar to take it back. And did that happen? Well, maybe it happened two or three times. So in the light most favorable to the conviction, we have maybe it happened two or three times in an 11-year period, and we have he possibly or probably fronted cocaine to me two or three times, although I can't think of a single instance. There is no one, there's not one instance in the record of it. And most importantly with respect to this return policy, there is no evidence that Schmidt ever went back to Polgar, here's the bad cocaine, and Polgar issued new cocaine, gave him a credit toward the next purchase. And so it is our contention that Mr. Schmidt's testimony that maybe it happened two or three times, it reasonable doubt. And incidentally, this court has already talked about refunds being a just a germane or a generic part of buyer-seller relationships, and that comes from the Nunez case, that returns for refunds are normal incidents of buyer-seller relationships. It's not tantamount to a consignment arrangement. Correct, and I think the government has conceded in its brief on page 25 that this is not a consignment case that we have in front of the court. And I would just point the court, and I'm going to, I don't want to burn my rebuttal time, but the Johnson case, upon which the Brown case, which is the lead case in my view, Johnson kind of is the backbone of Brown, and Johnson set out a bunch of factors in addition to the three that became the most important. And they said sales on consignment or credit, which we do not have here, an agreement to look for other customers. There's no evidence of that in this case whatsoever. In fact, there's evidence to the opposite, that Schmidt purposefully kept Paulgar insulated from Mr. Myers. Paulgar and Myers never met. Another factor, payment of commission on sales, we don't have that here either. One party advising the other on business practices and giving advice, that's not in the record here. An agreement to warn of future threats from law enforcement or competition, there is no evidence of that whatsoever. Unless the court has questions, I'll save my time for rebuttal. Thank you. Jason Baum on behalf of the United States, good afternoon. There is three factors, as opposing counsel just represented, multiple wholesale transactions on credit. No doubt in this case there are multiple transactions in 11-year period, every six weeks, three-quarters of a kilo of cocaine. That is not personal consumption amount, three-quarters of a kilogram is not going to be consumed by Mr. Schmidt. So the only question left is whether there is transactions on credit, and Mr. Schmidt testified that there were transactions on credit. Well his testimony was extremely vague and contradicted by what he had said previously and consists of, well maybe a couple of times, I mean that's the extent of it. That's just so vague, I think that's what you're hanging your hat on. It's hard to characterize that as proof beyond a reasonable doubt of a conspiracy as we've defined that term in Johnson and Brown. Your Honor, I guess two responses. First with regard to how it differed from what he told investigators the night he was arrested. He testified, I believe, that he didn't trust what the government was telling him the night that he was arrested and was not completely forthcoming with them that night either. So I think there is an explanation for why it's different. He was also challenged with the difference at trial and the jury returned a verdict. Split verdict. That's correct, Your Honor. What's your best speculation for why that happened? It looks like a compromised verdict to me, Your Honor. I don't know other than to say that. The second part is not only was there his testimony that there was credit transactions did occur, but that he did have the ability. Maybe, probably. Yes, he was pretty adamant on cross-examination that no, it happened. He would not agree that it was never. He also was able to return bad cocaine to Mr. Polgar. I guess I would like to clarify our position. We're not saying that he could just return leftover unsold cocaine that was perfectly fine. It's pretty clear to me that the record that he could return bad cocaine back from my clients. Once I sold it to them, I was done with it. Buyer regular retail transactions isn't covered by the uniform commercial code. You're not able to just return, generally in my experience at least, you're not able to return bad cocaine unless the person you're returning it to has some interest and information about what you're doing with the wholesale cocaine down the line. I mean, it's knowledge, right? And knowledge is not enough. Obviously, he knew that Mr. Schmidt wasn't ingesting that amount of cocaine himself, but the case law is very clear that knowledge isn't enough. You need to have a vested interest in what happens down the line. Right, informed. I guess the one aspect knowledge would be the informed part of his cooperation, but he's also interested in it. If he wasn't interested in what happened down the instead of taking it back, and I think it's the taking it back part that shows his interest in what happens down the line. Except the case law is against you on this point as well. We've held that a return policy is not the same as consignment sales. Nunez does say that it says it ultimately it affirmed the conviction in that case, and I guess we do think that we would be skeptical like the Fifth Circuit was in Delgado that that's really what happens in illicit drug transactions that return policies are just a standardized part of the drug trade. We think they are much more evidence of a conspiracy that Mr. Polgar was interested and informed of what Mr. Schmidt was doing with the cocaine once he gave it to him. Unless there are any other questions for me I will. Thank you very much counsel. You have a minute. Thank you very much, I'll try to make good use of it. Best case scenario the evidence is an equal poise and this court has held in Johnson that if the evidence is an equal poise the conviction can't stand based on circumstantial evidence alone. I think this particular case is why there is a buyer-seller exception and we are asking the court to take a holistic view of this record and to consider the totality of the circumstances and to find as a matter of law that this maybe or probably two times in the scope of 11 years doesn't cut it in terms of a holistic analysis and we are asking that the court reject Delgado which is is not persuasive to this court and follow Nunez which is this court's precedent. Thank you very much your honors. Thank you. Thanks to both counsel. The case is taken under advisement and the court will be in recess.